Case number 20-5346. Council on Radionuclides and Radiopharmaceuticals Inc. of Delaware Corporation Appellant v. Xavier Becerra in his official capacity as Secretary of U.S. Department of Health and Human Services and United States Department of Health and Human Services. Mr. Seagroves for the Appellant, Ms. Kaiser for the Appellate. Morning, Council. Mr. Seagroves, please proceed when you're ready. Good morning, Your Honors. May it please the Court. The fundamental question presented in this APA appeal is whether an object of final agency action that requires the object to self-report information to the federal government must quantify the cost of complying with that reporting obligation in order to establish Article III standing. We respectfully submit that the answer to that question is no. Now, this Court has certainly said that simply because someone is an object of agency action does not automatically create Article III standing for the object. This Court has made clear that the Court must conduct a case and context-specific inquiry. Here, of course, the context is the Medicaid drug rebate program, which this Court most recently evaluated in Ipsen. At the heart of that program, the engine that drives it, if you will, is the obligation that is statutorily imposed whereby participating pharmaceutical manufacturers must self-report information for their products that satisfy the threshold statutory definition of covered outpatient drug, which is subsection K2 of the statute. The context at issue here also provides that the failure to timely report required information can, according to CMS, subject the manufacturer to per day civil monetary penalties of $10,000 per day. It is CMS's view that that penalty provision in the statute, which was not specifically addressed in Ipsen, but that that particular statutory provision does not have a knowledge element. It is, according to CMS, essentially a strict liability provision. Can I ask about the declaration and tell me if I mispronounced Mr. Moustaphanos? That's correct. Has, I'm just going to call the company AAA to save me a lot of words, has AAA, not the reports, and have they paid any rebates since this rule was promulgated? The record answers one of those two questions, Your Honor. The record, and this was actually introduced into the record by CMS in its reply brief, which is in the district court, which is docket number 22. The government there on pages four and 18 of its reply brief and Thank you. Yeah, I apologize. The government pointed out there that one of the two products identified in the AAA declaration, namely Lutathera, had been reported following the final rule, had been reported, data for that product had been reported to CMS. So CMS put that into the record. But it's your position as a legal matter, presumably, I mean, I'm sorry for my sarcasm, that in order to establish standing, it is immaterial whether any of the members have actually filed reports or paid rebates. And so it's not surprising that that information is not in the JA. I think that's correct, because I think this court has been careful to say that on numerous occasions that one does not have to demonstrate a past injury in order to establish Article III standing in fact. And Judge Miller, just to make sure I answered your question as it relates to the payment of rebates, the record is silent on that issue. And I personally, I do not know the answer to that question. Go ahead. No, please, please. Doesn't there have to be some indication that the rule causes some injury? Because if the, if, let's just use AAA because they're the only entity that can establish standing now. The rule had to cause, the rule had to do something that caused a change to their detriment. It had to impose or have, have to impose a legal consequence or there be a legal consequence that flows or is caused by the final rule. Here the final rule's reporting instruction, which is JA61, CMS evaluated the threshold question of whether radiopharmaceuticals as a class satisfy subsection K2's definition of covered outpatient drugs. And CMS answered that question in the affirmative and then said, in language that is quoted in our brief multiple times, said that radiopharmaceuticals are to be reported in the same manner as other covered outpatient drugs. So suppose then that has to have a consequence and I take it the, the inference is that it results in reporting obligations that otherwise wouldn't exist. Yes, your honor. And that's and where does the, the declaration just doesn't say that. And I guess one, one question I have is it at least seems conceivable to me that entities who manufacture radiopharmaceuticals were engaging in the reporting obligations anyway. I mean, at least I don't know that that's not true. And if that's the case, then wouldn't we be benefited by some indication that there is an entity that wasn't reporting, but as a consequence of the rule, it will have to report or it is inclined to report or, or something's going to happen as a result of the reporting. It may not be much to do because maybe that's just the nature of things, but I don't, I don't see that predicate part about how this entity is chain is going to change its behavior as a consequence of the rule from something that it was doing beforehand to something new that will come up, come about after the fact. Yeah. The record your honor is silent as to whether prior to, um, the final rule, uh, whether any radio pharmaceutical manufacturer was reporting information. The record does reflect, however, that following the final rule, AAA did report, uh, information. I think it's also important to point out that AAA then if AAA was reporting before also, then what's the injury from the rule. Yeah. The, the, the injury there would be if I'm trying, I might want to analogize it to committing an act. That's not a crime. I mean, it's, it seems to me that if they were doing it before as a, they were overly conservative and they're concerned about CMS's position that failure to timely report can result in civil monetary penalties and suspension from the program entirely. Um, it, it seems to me that the fact that they were doing it before and, and now CMS has said definitively put them on notice that you have a statutory obligation to report. Uh, the fact that they did it in a, as a conservative matter prior to the final rule, doesn't mean that the final rule hasn't changed the legal consequences of them failing to report. I mean, it's, it's always as, as is often the case with standing, it's hard to, to disentangle the merits and the standing. But as I take it, CMS's position is that under the bundles, the administration of a prescription drug with a hospital service and bundles the charging for it, that that's within the limitation of the definition of a covered outpatient drug. Whereas if the state, and this is going to vary from state to state, if the state bundles the charge, that it does, that you do have to file and participate in a rebate program. And that, that seems to, so to the extent that that's, that there's some new unclarity that the rule, I mean, I understand that the industry wanted more and didn't get it in terms of a categorical thing. Like you guys are not subject to this, but, but I'm, I'm having trouble seeing what your theory is of how the rule created a kind of a trap for the unwary and that you have members who can show that their conduct and, or, you know, concretely described risk shifted. Certainly, your honor. So, so the discussion in the final rule that immediately follows the how does the, the statutory limiting definition subsection K3, how does that affect essentially a manufacturer, a participating manufacturer's obligation at the threshold to report information? And essentially CMS takes the position that whether or not the state of California, for example, pays for your thing separately or not, that only affects rebate liability. That does not affect the threshold obligation to report information. Because if we keep in mind the chain of events here in the statutory scheme is that the manufacturers self-report information to CMS. CMS then provides that information to the states. And on page 62 of the joint appendix, the final rule makes clear that CMS relies upon the states to then use the information that has been self-reported by manufacturers to determine whether a rebate is owed because the states are the ones who are paying for the rebate. Can I go back to this? You mentioned the government's acknowledgement that at least Estaluda, Thera, AAA has been filing reports since the rule was adopted. Do we know whether those same reports were filed before the rule was adopted? We do not. The government and the district court provided a link to a CMS website that had the data. When one pulls up that link currently, one sees that, well, I should say this, Estaluda, Thera was not approved by the FDA until after the final rule. I apologize, light bulb, I apologize. And it doesn't help that much anyway, because then we don't know that anything changed as a consequence of the rule. Just because reports are filed after doesn't mean they weren't filed before, I think, unless I'm missing something. So the report to which, or the database that CMS linked to in the district court demonstrates that Estaluda, Thera, the first reports filed by Estaluda, Thera were not filed in 2018, which is two years after the FDA until 2018. But AAA has other drugs. I don't know how far back this database goes, but does it show, or can you tell us whether Estaluda, Thera filed anything before as to a radionuclide? They did not. For example, the other product that is specifically identified in the declaration, the database, CMS's database reflects that no reports were filed for that. For that one, it doesn't reflect that any reports were filed after either, or does it? It lacks any information in it for any such reporting, which would indicate that no such. I guess the bottom line question for me, I think for my colleagues as well, is there anything in the record that shows that there was some radiopharmaceutical as to which reports were not filed before the rule, but are filed after the rule? No, there's nothing to that point in record. We go back to- Is there anything on this website, like the judicial notice thing? Yeah, the website itself does not, the database, a CMS database does not indicate whether a particular product is a radiopharmaceutical or not. It lists NDC codes and the like. So I don't think that one can look at that database and reach an assessment of whether conduct necessarily changed pre and post rule. Your association members should be able to answer this in about five minutes, right? I would say so, Your Honor. I would also say that, again, if we keep in mind that this is a statutory scheme where CMS takes the position that essentially there's strict liability for failure to report, it is- You have to marry that with their reporting stuff is confusing or more complicated maybe for radionuclides. I don't know if I'm saying that right either, but we're here to work with you. That makes it a little bit harder to find a risk of prosecution. Are you aware of any radionuclide manufacturers that have been fined? Have any of your members been fined since this rule was adopted for not properly reporting? No. For example, in Ibsen, after oral argument, the government submitted a letter that listed past instances in which the failure to report CMP provision had been implemented. And my understanding is that none of those examples involved radiopharmaceuticals. So Mr. Sugrov, I'm a little confused about your characterization of the scheme as imposing strict liability. I had thought that your member's declaration said that manufacturers must make good faith reasonable assumptions. And if they're doing that- Well, first of all- I don't think that CMS is going to interpret its assumptions. It's a bungled good faith effort as amounting to a knowing false reporter. I guess I have two questions, just to be clearer. Where in the statute are you looking to find the strict liability? Is that the late filing provision or- Yeah. And if I could clarify at the beginning, it's CMS's position that there's no knowledge element. And this is a subsection B3C Romanet 1. And that's- Can you tell me in the- Right-hand column. Send them to the blue. Oh, it would help to have the brief from the right case. The heading is failure to provide timely information. So timely. So there's maybe a strict liability for lateness, but your argument is not that the new rule makes it imminent that AAA will be late with its filings. No, but we rely upon both of the penalty provisions, both that provision and the false information provision. So when we say the declaration says that one has to make reasonable good faith assumptions, well, first of all, that's a factually unrefuted statement in the record. But I think that when we were talking about that aspect of the declaration, we're talking about the round peg square hole problem with the Medicaid drug rebate program being set up and administered in such a way that, for example, to report the current reporting structure as such, and the reporting structure was such at the time, that the dosage data millicuries, for example, which is an important term in the radiopharmaceutical context, was not an option. And CMS- I'm just dialing back to your assertion that there's strict liability. I just don't see it. I think in the very column that you pointed to, which is what I had read, any manufacturer with agreement under this section that knowingly provides false information. So if you- and then there's a timely, an obligation to timely provide information. If you do your best, provide some information, turns out it's not what CMS wants, you're not going to be liable, right? You need to timely file something. And CMS says, we stand ready to help. And then the knowingly is only when the information is false. They've tried to guide your members and your members have nonetheless obtusely given the wrong information. And that's not what they're claiming is their problem, is it? Well, again, if we look at the CMP provision for failure to report, it has no knowledge element. CMS represented this court in Ibsen that there is no knowledge element. You violate that. Factually, you violate that. You're at risk for CMPs. I'd also, to put in context CMS's statement in the final rule that CMS remains willing to work with radiopharmaceutical manufacturers, the administrative record in this case reflects dating back to at least as early as 2010, which is actually prior to the proposed rule. The council was working with CMS in trying to deal with this issue and get the clarity that it needed. So that's at least a six-year process. So for the agency to say in the final rule, we will continue to work with you, I think one has to look at the record and see, well, what has been the course of dealing thus far? And we're talking about a six-year process. Is there a course of such dealing prior to the promulgation of the proposed rule? Were radionuclide manufacturers already, many of them assuming under statutory language that they had to file these reports already doing so, so this confusion even pre-existed the proposed rule? That's not in the record, Your Honor. But it's not not in the record either. I mean, we don't know that that wasn't the case. True. Or we don't have any reason to think that AAA thought that the state of the world beforehand was in one direction or the other, as with respect to the particular point, the judgment that raises. That's correct. Because again, look, we're talking about a six-year long process of engagement between the council and the agency. I'm just sorry. This is this is my mistake. Is that six years the time period between the proposed rule and the final rule? No, Your Honor. So the record, the proposed rule is 2012. The final rule is 2016. So four years. The engagement between the council and CMS, and this is reflected in the administrative record, and this is in the JA, just to be to be clear. And then, for example, if one goes back to, if I could, if you indulge me, I realize I'm over my time, but there's a letter from CMS to council for the council. That's a poorly way to put it, but there's a letter in the record where, again, this is prior to even the proposed rule. If you indulge me, or if I, if I, maybe I'll bring it up in a rebuttal. That's fine. But to the rest of your recollection, there's a letter even prior to the proposed rule that talked about this topic? Yes, Your Honor, and it's JA 121, and it says, quote, consequently, we, and this is CMS, believe that radio pharmaceutical manufacturers need to submit the necessary baseline data and pricing information to CMS. That was even prior to the proposed rule? Yes, Your Honor. All right. If my colleagues don't have additional questions for you at this time, we'll hear from the government. Thank you, Mr. Segros. Ms. Kaiser. Good morning, Your Honor. May I please support Bridget Kaiser for Secretary of the Center for the United States Department of Health and Human Services? A little bit of an, I'm sorry, I'm getting a little bit of an echo from your audio. Is this a little better? A little better when you're leaning closely, yes. Okay, I apologize, Your Honor. So, as we've discussed, the council's associational standing depends entirely on AAAs, and the district court twice looked at that declaration and found it wanting and establishing standing. Is that exactly right? The Bragg Declaration says, I've never been in this Medicaid program, never needed to before, and if I have to come into it, it's going to take a ton of paperwork from me that costs money, right? It makes the economic analysis and complaint there about what it'll take if it has to come into the Medicaid program. Isn't that relevant to show that this rule causes a manufacturer of these pharmaceuticals, that's a member of this association, to have to make this economic choice between taking on this economic burden or not being reimbursed under Medicaid? Well, the Bragg Declaration, which the council doesn't rely on here, didn't actually say, as I recall, that that manufacturer wanted to participate in the program or didn't want to participate in the program. I think that's what Judge Walton concluded about it, right? But it certainly makes clear these reporting requirements impose an economic cost, right? We have that fact in the record. It's pretty self-evident, but these reporting requirements impose an economic cost. The government doesn't dispute that these reporting requirements impose an economic slash resource cost on participating companies, does it? On manufacturers generally, what I would say... Anybody who has to do, I don't mean generally, just is there any way anyone can comply with these reporting requirements without expending costs, resources? I don't, I wouldn't say that, but what I'd say is that... I'm sorry, you wouldn't say what? It was a question that I was asking you. Is there any way to comply, yes or no, with these reporting obligations that is cost-free and resource-free? No, I don't think you can cost-free comply with reporting requirements, but I would point out that the declaration submitted by AAA doesn't appear to complain about the cost of complying with reporting requirements. What this declaration focuses on instead... We have an obligation to satisfy ourselves with jurisdiction. I think that runs both ways. If it's crystal clear on the record, and you have just admitted that this new rule imposes a regulatory obligation, and that regulatory obligation causes an injury, costs resources. Just does. Clear as day. Why doesn't that mean they're standing? We have jurisdiction. We have duty to exercise what jurisdiction we have. Well, I think the plaintiff has the burden of establishing that it's injured by this rule. As has been observed, we don't know whether the rule caused it to report or not. We do know that the rule, that it has been reporting under this rule. It's been reporting under the rule which inherits the statute. Now, let's be fair. Your rule itself said you're clarifying this. Yes. Okay, then. So under the rule, they're complying with these reporting obligations, and it was really hard. It's really hard for him, for this company. If I could take one step back for a moment. What the rule says is not that every radiopharmaceutical is a covered outpatient drug. It says that some of them are when the limiting condition doesn't apply, the limiting provision. As has been discussed, under the limiting provision, if the state pays on a bundled basis for radiopharmaceuticals, then they won't be covered outpatient drugs. The council itself has said that virtually all the time, its drugs do fall and are paid for on a bundled basis. But they don't know at an upfront basis, right? The reporting obligation kicks in long before some state seeks a rebate. And I take it these companies, they don't have any control over how somewhere down the line their drug is billed or not by third parties. So the reporting obligation exists, I should think across the board, they've got to do it. If they want to get paid under Medicaid, or they want to get paid, even if it happens, it's drug is used in Medicaid to treat a Medicaid recipient, right? They can't know upfront at the time the reports are due, how their drug is going to be billed, can they? Well, I suppose they could do some investigation to find out if any state is billing separately for their drugs, as I understand. Even if they hadn't in the past, that wouldn't stop them from doing it going forward. They can't, this is something they can't, they can neither control nor know at the time of the reporting obligation, right? Particularly the way these drugs are used, right? I agree, it is a situation. The limiting provision does not alleviate folks of a reporting obligation. Or does it? I mean, that's a question for you as the administering agency. If today not a single state separately bills for radiopharmaceuticals administered as part of a bundled service, does the industry still have to file because it's a possibility that a state might decide to break that out later? What's the government's position on that? There's no reporting obligation unless you choose to enter the program. Once you're in the program, like AAA says, why isn't it enough that they said, we're in the program, we have a Medicaid drug rebate program agreement with CMS? Why isn't that enough to make clear that whatever beef it has, meritorious or not, with the rule is one that it has standing to raise? What more would you want as a standing matter than, hey, I'm in the program? Well, the two injuries that I identified coming from the final rule were rebate liability, which is not mentioned in the declaration. Rebate liability would only flow if the limiting provision didn't apply to either of these drugs. And the other one being enforcement actions, which has already been discussed are unlikely in a situation where we've invited manufacturers to come discuss with us any reasonable assumptions they might want to make. Can't we at some point just use undisputed common sense under the regulation that says, you radionuclide manufacturers, I'm looking at you and I'm pointing at you. You are now covered. If you had any questions before, we have exercised our authority and we are making crystal clear, you are now regulated. If you want to be part of this payment program, you're in it. And as you just said, the statute requires you, now that we've pointed to you and said you're covered, file reports. I would say constantly on a quarterly basis, but that's just an ongoing duty to file reports that are at least complicated in this area. And as you have admitted, will require resources and to pay rebates. Only if rebates are due. Are you aware, is Judge Pillard's predicate accurate? Is there no state in this country that bills separately for radionuclide medicines, pharmaceuticals? No, it varies by drug. Okay, it varies. So exactly. So they can't know going in. So they all have to report and some percentage of them are going to have to pay rebates and they may not know coming in whether they're going to have to or not. Can you tell us that AAA has never had to pay a rebate? Do we know that? I don't know, but it was AAA's burden to identify whether it did, I think. I don't think that the district court had an obligation to guess at that or to guess. There's no guessing required for reporting obligations. And there's no guessing for whether those reporting obligations impose a cost, resource cost on AAA. There's no guessing as to that. I mean, we've said before, Economics 101, we don't need to be led by the knowest to everything. Right. I would say this. As I mentioned, the declaration appears directed entirely at wanting more guidance. Okay, so if I put that one sentence in that you as a government have already admitted is universally true. Reports required by AAA and reports are going to take more resources. They're going to have to expend resources to do it. If they add that sentence that is self-evidently true, then there is standing? If what they want is not to report. If they say that as a result of this rule that pointed to us by name and said, you're now covered, I have to file reports. And that takes resources. As a result of that rule, they would have standing, yes? That would show an injury, but I don't know that it would show standing. Okay, just on the injury question, that's all. I guess you have superiority on that. It would show injury unrelated to the rule? I think they would have to say that they report because of the final rule rather than because of the statute. If it's a particular entity, let's take away from the association just for now. I know that this is an association, but if it's a particular entity and they file a report that says, beforehand, we weren't filing reports because we thought our radio pharmaceuticals didn't constitute CODs. But now you've told us that they do, and so we're going to have to file reports afterwards. We're injured. That just seems like a straightforward case of injury. There's no doubt that the injury requirement is satisfied in that situation, I take it. Yes, as alluded to earlier, the council was aware that CMS took this position even before the final rule. But if their allegation is, we weren't doing it before, now that you've put it in the comment, we feel like we have no choice. Therefore, we're engaging in reporting that we weren't engaging before. It's hard to see how that doesn't satisfy the injury requirement. Certainly, if the declaration said all of that. Right, and it's absolutely clear that there are reporting obligations that must be met by manufacturers of radio pharmaceuticals. Now, of course, I know that there's this subsequent question about whether they get out because of the limiting principle, but just put that to the side because we're only talking about reporting obligations at the front end. It's absolutely clear, and there's no dispute, and it's hard to see how there could possibly be disputed, that as a consequence of being part of the program and having a drug that qualifies as a COD, reporting obligations are owed. So then, it seems to me the only question is, were they reporting beforehand anyway? And as to a particular entity, maybe there's a question whether they were reporting beforehand anyway. I think one of the questions is, if we're dealing with an association that covers the industry, is it not fair to just assume that at least some people are now facing reporting obligations that they otherwise wouldn't have faced? And that's just so obvious from everything we know about this regime that the injury requirement is satisfied. Well, a couple of things I would say. First, given the nature of this declaration, it's not at all obvious that they don't want to participate in the program, which after all comes with the benefit of mandatory Medicaid coverage of your covered outpatient drugs. So it's not, without knowing what the precise injury of the identified association member is, we can't know whether the relief sought redresses that injury or whether the final rule caused it. Secondly, I would say this court has recognized that it's in Swanson Group, that the question is not whether they could have standing to bring the claims at issue, but whether the evidence the plaintiffs presented in support of standing was sufficient. And in American Chemistry Council, this court said, our standard has never been that it's likely that at least one member has standing. I think they have an obligation to come forward with one association member who has an injury that's clearly caused by the final rule and redressable by the relief that counsel seeks. Well, I'm going to follow up on this, what the rule changed universe, because I'm very confused. You all were telling before the rule, they were supposed to report. Were these, were radio new clients getting reimbursed or getting paid somehow under the Medicaid program, even before this rule? I don't know what all the different mechanisms were. Okay. And even if they were reporting something then, maybe they were reporting in the way that they tell us in the brief, they package information. The reporting, what they want to say is sort of, it's about a Procrustean effort to try to take the information that we have about our pharmaceuticals and fit it into the way you want covered outpatient drug reporting under the scheme and under the final rule. So even if they were reporting something before and participating in Medicaid or receiving Medicaid reimbursements before, by reporting information in the form in which they have it before, if the consequence of this rule is that you now have to report just like other covered outpatient drugs. And so you're going to have to apply costs and resources to report in a way you haven't reported before. And that CMS acknowledges is a difficult fit for your particular type of drug. Then that type of additional reporting burden would be an injury, correct? I think that could be articulated, yes, as an injury. I've articulated that would be an injury. Yes. Is that the reality here? Because no one tells me what's going on beforehand. I'm very confused as to, it seems like they were getting paid somehow. And it seems like Medicaid was already dealing with them for some way. And most of this is like, this new obligation doesn't fit what we do and even who we are. That's one of their merits arguments. Is that the delta we're talking about? Is that now to keep getting paid by, it's not that they want to participate in Medicaid, as you said previously, they were already getting paid and they're not going to lose that money unless they spend extra time and resources to figure out how to report in a way that they've never reported before. And that doesn't fit in their view, the nature of their product. Is that what's going on here? Well, most of the time before, as I understand it, radio pharmaceuticals have been and continue to be bundled. Most providers bill states on a bundled basis. And so it hasn't been... And when that happens... You said most, but was it universal? I'm sorry? You say most were doing it on a bundled basis, but was it universal? Were states universally paying them only on a bundled basis and something on the state end has changed? I'm not aware of any earlier... I'm not aware of all the history of whether any state has ever billed separately. I only know that it's most of the time they've been bundled. I think there may be renewed interest by states in approaching CMS about how they can bill separately because of the option for rebates. But most of the time, radio pharmaceuticals are billed on a bundled basis. I guess it just seems it's clear from the nature of the statutory scheme that you can't do it without expending resources, extra resources under this rule. Because you all don't dispute that this is a more complicated... They can't... It's not as easy to figure out how to fill out the reports for them as it is for maybe a pill manufacturer. Then why isn't it just evident from the scheme? Mr. Estafanos, who's struggling here, he and his company are struggling here to figure out how to do this, are expending resources in the process. He had to take his time to do the declaration, for goodness sake. I know that can't create the standing, but I'm not saying they're struggling. They're struggling here. That would be too easy. But they're struggling. They're struggling with it here and struggling means resources. We're going to have to meet with CMS. Right. I'm not sure of the... I'm wondering what the end game is here. Really? If we all know there's an injury, they just need to add a line. He's told us we don't know how to do it. You're saying, come meet with us. That requires resources, right? But it's not something... That requires resources, right? Yes, yes. Yes, your honor, it does. I don't dispute their good faith representation that we can't figure out how to do this because it's round peg, square hole, as far as we're concerned, right? That's right. Okay. That's a resource. We all know there's resources being expended. Why are we... We're going to go back and make them start all over again. This just seems like code pleading. You know, formalism for the state of formalism. If we all know, we have to be sure our standing exists, to be clear. But we all know it does. I think what I've... I don't think it will be possible to identify... To answer the redressability and causation questions without knowing exactly what injury the identified member... Injuries, we have to fill out these reports the way the rule requires them. It'll be redressed if they win. They may not, to be clear, but we have to assume on the merits. At this stage, they're going to win and they're going to obtain a ruling that they are not covered outpatient drugs subject to this reporting requirement. That seems like pretty clear causation of redress to me. Except that their declaration doesn't complain about the cost of reporting. It complains about a lack of guidance. Which requires them to do what? Under your argument. Come work with us. Or make reasonable assumptions. And that either one takes resources. Does it not? Make reasonable assumptions where? In your reports to us. And you stipulated that there you said... We're not doing fact stipulations here. But you said that requires resources 100% of the time. And working with you requires resources 100% of the time. But it's like one of those cases where we said this is just obvious basic knowledge on the statutory scheme. That if you're in it and you don't think you should be in it, you have the injury. Because the scheme requires us. Except this manufacturer doesn't say that it doesn't want to be in it. It doesn't say that it's had to pay rebates in it. It says only that it would like more guidance. This manufacturer is in a litigation that says we should not be in this. Well, that's what the council says. No, no. This association is litigating on their behalf. I think we can make that. That they share the view of the litigation that they are supporting through their declaration. That is, they don't think they should. Really, people have to in their declaration. We're going to kick them out on standing grounds. We can't see how we have a jurisdiction. We're not sure that this declaration by a client member of the association agrees with the litigation. That's what our theory is now. I think they should at least articulate that they have had to pay a rebate or that either one of their drugs has been swept into the definition of covered outpatient drugs when it ought not to have been. Here's a question. Is the fact that a company is entered into the Medicaid drug rebate program and has an MMS for these drugs, doesn't that imply that there's a state that separately charges for these because that's an essential triggering condition for both reporting and rebates, right? No, a manufacturer could enter into a drug rebate program on a prophylactic basis if they wanted to. They could report information and never a rebates. So on a prophylactic basis, it's just thinking if any state decides to do this, we want to be ready to recoup. We want to be able to get to participate and we recognize that we'll have to pay rebates then, but it's not now up and running in that way. And so that's what you're looking for is the company to say not only do they have an There is some circumstance in which they're obligated to pay rebates and nobody knows that. Nobody's in this record that hasn't been made clear and it's your view that that's the plaintiff's burden. Yes. As I understood, opposing counsel said he's not sure whether this manufacturer does have rebates. In the briefs, they said they flow automatically, but that's just not the case. So, well, they only flow automatically if there's this. I thought you had said you didn't know whether any states separately charge and isn't that a precondition for rebates? Bundled service, but separate billing line for the radio network. And if there's no separate billing line, then there's no rebate obligation on the COD manufacturer. Right. I thought you said some states were separately. I don't know whether any state is separately building for either of these. But they're simply billing for radio drives. There are some radio pharmaceuticals that do pay rebates. Yes. And when you say filing on it or entering into agreement on a prophylactic basis, I heard Mr. Seagrove to say, you know, there's this and it was a focus of some of Judge Millett's questions, but I didn't have a clear takeaway. If I haven't entered into agreement and it turns out later that my radionuclide, the situation changes on the ground and the state starts billing it as a separate line item, I'm not exposed to liability all of a sudden, am I? No, if you're not participating, the consequence there won't be federal financial participation paid to the state. So unless and until I, okay, the state won't be paid for it. So the state presumably would have an interest in telling me, the manufacturer, hey, we're going to separate this out as a line item. It'll be good for us, might be good for you. Yeah, you'll have to pay rebates. But, you know, that's coming. Why don't you file, get an agreement, and we're going to go from here. That's right. There's no penalties if you don't participate in the program. The incentive will be if the situation changes on the ground, and then the state doesn't want to buy your drug. But I just don't know how these things work, because it sounds like some of their things go to these specialized pharmacies. And then those pharmacies, I guess, provide it to the hospitals or the doctors' offices. Do the, and if you can't answer, maybe Mr. Seagroves can, do they get paid up front? Do the manufacturers get paid up front? You know, someone's ordered this thing. We sent it off to the pharmacy. We're getting paid now. Who it ends up, to whom it ends up going into, we have no idea. I'm going to defer to opposing counsel on how his plans get paid. I'm sorry. Thanks. The kind of thing that might have been helpful to have laid out in the declaration to answer some of these ambiguities. But let me ask my colleagues if they have additional questions for you. Ms. Kaiser, make sure that we don't. Okay. Thank you, Ms. Kaiser. Mr. Seagroves, we'll hear from you for rebuttal. Why don't we, we'll give you two minutes and we'll see where it goes. Thank you, Your Honor. So to answer the, to provide the court with a record citation where it can go into this question of how the mechanics work. In fact, it is true that, and this is reflected in the background paper at JA 113, that a radio pharmaceutical manufacturer sells its product to a radio pharmacy and gets paid by that customer. It does not bill the state Medicaid program directly. Instead, typically that's whatever service provider provides the end service using the radio pharmaceutical. I think one of the things that we've seen here this morning is, and why we're, I think, wrestling quite a bit with causation. So am I participating in Medicaid at all? It is a condition. Yeah. Because you're getting paid by the pharmacy that's, I don't know that the pharmacy knows whether the ultimate recipient is going to be a Medicaid recipient or Medicare or private insurance. It's a condition for, if you want to have any of your products covered by Medicaid and not just radio pharmaceuticals, but any, you have to participate in this program. And I would say that, you know, we talked quite a bit. I thought AAA here only did radio. The record doesn't say that that's what they only do. It identifies two radio pharmaceuticals that a manufacturer doesn't speak to its portfolio beyond that, you know, the government. So when it says we manufacture and distribute pharmaceutical products, it doesn't mean exclusively. Okay. Correct. But that also makes, doesn't that enhance the ambiguity of the declaration? Because one question I had in reading it at the outset was they say, we have entered into a Medicaid drug rebate program agreement. And I asked for these drugs. So the fact that it may be registered and have an agreement with Medicaid actually doesn't tell us anything about whether that relates to the issue in this case, does it? Well, I think it does because it shows that it's subject to the reporting obligation, the potential rebate liability, and the potential penalties for failing to comply with CMS's reporting instructions. You know, the government. Yeah. If it's drugs, is that what you mean? Because once it registers, it's registered for all of its drugs. Correct. The rebate agreement is not product specific. It's essentially everything. I think it's important to point out that the government didn't raise causation in the district court. Now, certainly the government can raise it for the first time on appeal. But when we look at this factual record and we try to understand what Mr. Segrost and his colleagues were thinking in the district court with this record, the government didn't raise standing for the first time until we sought summary judgment. And in doing so, the government's chief complaint was that we hadn't identified a single member. We rectified that problem. The government never made a causation argument or addressability argument. They raised that for the first time on appeal. I think that while the government's free to raise that argument on appeal, the degree of lenity that one should answer that question with the record that was created below, you know, one has to recognize what were the arguments made below and therefore what evidence was put into the record as a result. It's one last thing, Judge, to Judge Millett's point about, I think, referring to the Curiam declaration. I would just point this court to its decision and fund for animals, which is cited in our reply brief where there the court did not have an affidavit from the putative intervener at issue in that case who was found not to have standing. And this court nonetheless looked to the allegations made in another putative intervener's declaration. And in fact, the arguments made in the opponent's pleadings in that case. So for those reasons, it's been a very long argument. Can I ask one quick question? Go ahead. I have one question. Please, Judge Millett. I'm just trying to understand something. So there's a Medicaid state utilization data table for 2021 that shows states have paid for Netspot and Lutathera. So would that indicate that they were built separately then? I don't know how else they would pay for them directly. Yes. So there's no question then that at least some states are billing separately for your AAAS drugs. And that's a matter of public record. Correct. Okay, sorry. And I just have one clarificational question. Just we spent a lot of time this morning talking about the potential burden in terms of reporting obligation that's imposed on manufacturers who become part of the program and then are CODs. I just want to make sure that that's right, that that is an injury that you in fact feel is happening and is undergirding your action. Yes. I think it's one of the reasons why, quite frankly, the council has been engaged in negotiations with CMS for now, if you can include this litigation, for over a decade. The notion that the AAA declaration doesn't expressly say that we don't want to report this information, I think as Judge Miller points out, I mean, it's filing that declaration in the context of litigation brought by its trade association that's saying CMS made a statutory error and that this stuff doesn't even satisfy the threshold definition of a covered outpatient drug. Right. But I think the question is, and therefore, X. And the therefore could be any number of things because there's more than one type of injury that's been bandied about in this case. And but one of the easiest ones to get one's mind around is maybe the most straightforward one that comes about, which is that this imposes, if not, and I'm not necessarily suggesting that it's reporting and in the ex-ante regime, there wasn't any reporting at all, but it's that there is a different kind of reporting obligation, which I'll just call a new reporting obligation that wasn't evidenced before. There is a reporting obligation that is a direct product of final agency action. And it wasn't present before under the statute. Correct. I think that while the 2000 letter I mentioned from CMS, which predates the proposed rule, under Ibsen, for example, whether that could be characterized as final agency action, I think is subject to some question, but there's no question after notice and comment, and the government's never made a final agency action argument in this case, that the final rule definitively resolves that issue. CMS acknowledged that there had been ambiguity and confusion about this. Well, they acknowledged- It was creating clarity. Correct. The final rule in this JA-61 specifically notes that it received a comment, and the government's brief in this court acknowledges that that comment letter was from the council. And in fact, the preamble discussion of this issue, as it paraphrases a large paragraph from the council's comment letter. So I think the cause and effect, if I may, there is pretty clear. And the new reporting obligation imposes compliance requires an expenditure of resources that would not have been required beyond what was required before to engage in whatever reporting was done before. Well, the reporting obligation is the same, but the consequences for violating it, I think, are markedly different, given the statutory penalty scheme. I mean, it's also- Wait, wait, wait, wait. So you're saying- Go ahead. I'm sorry. Okay. I think we're asking the same thing. So did you just say that whatever reporting they were doing prior to this rule is no different from the reporting they are doing after the rule? It's just that now we're swiping bullets about trying to fit our information into this particular format, because before, if we got it wrong, oh, well, but now if we get it wrong, we're doing the same thing. But now if we get it wrong, we feel like we're at risk of penalties. That's exactly right. The framework, if you will, the template for submitting this information didn't markedly change for these purposes because of the final rule. It's the same. It's like, think about it. It's like the same form. The form didn't change. Forms perhaps- Just they're worried about consequences. Correct. Correct. Oh, then I think I was confused about that. So there is no new reporting obligation. It's just that the consequence for not doing the reporting obligation that stayed constant throughout has changed. Well, I would say that there is a new reporting obligation because CMS has said definitively, you have an obligation to report, whereas they hadn't said that definitively prior to the final rule. But I thought you just said that actually the same reports that were being filed before are being filed now. It's just that the consequence has changed. Well, the record, so I should clarify, the record is silent as to the change in the, what if any change in the forms there were. The only thing in the record- You just told us it's the same form. Yeah. I mean, the information, and this is discussed in J62 when it's talking about, and elsewhere in the final rule, talking about the mechanics of reporting this information, whether something was a covered outpatient drug or not, for example, the category that one used wasn't, I think, greatly changed as a result of the 2016 final rule that's at issue here. The consequences of not filing certainly did change. I see. The what was considered a covered outpatient drug didn't really change as a consequence of the rule. Well, CMS, I think, would probably take that position in light of the 2011 letter. I don't think- And you all were operating under the assumption too. No, I think that we still viewed it as an open disagreement with the agency on this issue, which is why we sought clarification during the notice and comment process. All right. Unless my colleagues have further questions for you, Mr. Segrist, thank you to you. Thank you, Ms. Kaiser. We'll take this case under submission.
judges: Srinivasan, Millett, Pillard